IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00291-RM-MEH

JEREMIAH AXTELL,

     Plaintiff,

v.

CITY OF LAKEWOOD, *et al.*,

     Defendants.

---

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

**Michael E. Hegarty, United States Magistrate Judge**.

In his Second Amended Complaint ("SAC"), Plaintiff Jeremiah Axtell ("Plaintiff") brings numerous federal and state law claims against a total of thirteen defendants. ECF 134. This case revolves around Plaintiff's encounter with police and paramedics in which he alleges he was unlawfully arrested and injected with ketamine. There are currently four pending motions to dismiss: (1) ECF 145 filed by Defendant Gretchen Schad; (2) ECF 148 filed by Defendants EMT John Herrera, Chief Don Lombardi, Paramedic Austyn Onstott, and West Metro Fire Protection District[1] (collectively, "West Metro Defendants"); (3) ECF 149 filed by Defendants City of Lakewood, Sergeant Creighton Bates, Agent Michele Deleon, Chief Daniel McCasky, Agent F. Saul Palomo, and Detective Daniel Simpson (collectively, "Lakewood Defendants"); and (4) ECF 155 filed by Defendants Dr. David Richter and Dr. Peter Vellman (together, "Doctor Defendants"). The motions are fully briefed and have been referred to this Court for a recommendation. ECF

---

[1] Plaintiff appears to interchangeably refer to West Metro Fire Protection District as West Metro Fire Protection District, West Metro Fire Rescue Protection District, and West Metro Fire Rescue.

150; ECF 152; ECF 154; ECF 156. For the reasons described herein, the Court respectfully recommends granting the motions.

## BACKGROUND

### I.    Factual Background

The following are the materially relevant factual allegations made by Plaintiff in the SAC, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff met Anita Springsteen in March 2019 and began a long-term relationship with her. ECF 134 at 6, ¶ 12. During the summer of 2019, he helped Ms. Springsteen with her (ultimately successful) campaign for Lakewood City Council. *Id*. ¶ 13. A memory care business moved into Ms. Springsteen's residential neighborhood in 2013 and began running a group home. *Id.* at 7, ¶ 17. Plaintiff contends that the memory care center had many problems, and neighbors worried that employees were guilty of elder abuse. *Id.* ¶¶ 17–18. Employees were "especially rude to Ms. Springsteen because she had reported them . . . for their sanitation, health and elder abuse violations." *Id.* at 7–8, ¶ 19. Plaintiff asserts that "employees at the group home saw Ms. Springsteen's ascension to City Council as a threat to concealing their wrongdoing and a call for accountability." *Id.* at 8, ¶ 20.

On June 28, 2020, Plaintiff overheard employees calling Ms. Springsteen "a variety of ugly profanities when she asked them to dispose of an adult diaper with feces spilling out from their facility that had sat in the roadway in front of her driveway for over a week." *Id.* ¶ 21. Plaintiff intervened and asked the employees to pick up the diaper. *Id.* ¶ 22. In response, the employees "laughed and scoffed at him and egged him on as he walked away up the street." *Id.* Plaintiff returned to his house, but the employees called the police. *Id.* ¶ 24. Specifically, Stephanie Salinas

called 911 at approximately 10:45 a.m. to report that Plaintiff was "charging" the group home. *Id.* at 9, ¶ 25. When the 911 operator asked Ms. Salinas if Plaintiff had any weapons, she stated, "He says he has knives in his pockets or something like that." *Id.* Plaintiff refers to Ms. Salinas's comments as lies. *Id.*

Lakewood Police responded to the call and arrived at the group home. *Id.* ¶ 26. Plaintiff walked over to the police "to talk about the problem with the neighbors." *Id.* Defendant Agent F. Saul Palomo ("Agent Palomo") arrived at the scene first. *Id.* ¶ 27. Agent Palomo's "report states that he sat down the block and observed [Plaintiff] to see if he had weapons." *Id.* Observing only a phone in Plaintiff's hand, Agent Palomo then approached Plaintiff. *Id.* ¶¶ 27–28. Agent Palomo claims that Plaintiff "saw him and walked back onto the street." *Id.* ¶ 28. Plaintiff responds that he wanted to talk to Agent Palomo but that he "was immediately aggressive." *Id.*

From this point, as stated in the SAC, police reports and Plaintiff's account of events begin to diverge. *Id.* at 10, ¶ 29. Plaintiff claims he "immediately removed his jacket and pulled his shirt up to show that he had no weapons," but Agent Palomo wrote in his report that Plaintiff reached into his pockets. *Id.* ¶ 30. Agent Palomo then searched Plaintiff for weapons and found no knife. *Id.* ¶ 31. Plaintiff "then retreated from Agent Palomo to return to Ms. Springsteen's property." *Id.* ¶ 32. Agent Palomo followed Plaintiff "onto Ms. Springsteen's private property, pushed him, [and] searched him." *Id.* Plaintiff suffered an injury as a result of this encounter. *Id.*

Sometime after, Defendant Agent Michele Deleon ("Agent Deleon") arrived at the scene. *Id.* at 11, ¶ 35. She immediately pulled out her taser and pointed it at Plaintiff. *Id.* Ms. Springsteen, who was standing on the driveway, asked officers to calm down. *Id.* ¶ 36. She also started recording the incident on her cellphone. *Id.* ¶ 37. When she realized she was being recorded, Agent Deleon put her taser back in its holster. *Id.*

Voluntarily, Plaintiff "sat down, and then laid down spread eagle, on the driveway so as to appear unthreatening and submissive to officers and to diffuse the situation." *Id.* ¶ 40. Despite this, "three officers came up onto his property, forced him to a seated position, and forcefully and painfully handcuffed him behind his back." *Id.* at 11–12, ¶ 41. Specifically, Plaintiff alleges that Agent Deleon put her "knee into [his] spine and effect[ed] a 'twist lock.'" *Id.* at 12, ¶ 44. Also, "[a]gents forced [his] arms and wrists sickeningly backward into painful positions over and over again, causing abrasions and ligament damage." *Id.* ¶ 45. Plaintiff claims that the entire encounter caused "injury to his shoulder, back, neck and wrists." *Id.* at 11–12, ¶¶ 41–42. Plaintiff remained in a seated position for approximately forty-five minutes. *Id.* at 12, ¶ 43.

Roughly twenty-five minutes after Agent Palomo seized Plaintiff, West Mesto Fire Protection District ("West Metro") personnel arrived. *Id.* at 14, ¶ 51. Plaintiff and Ms. Springsteen admitted that Plaintiff had recently consumed alcohol. *Id.* ¶ 52. Officers determined that this consumption of alcohol was in violation of a protective order. *Id*. at 13–14, ¶¶ 50, 52. Defendant Paramedic Austyn Onstott ("Paramedic Onstott") arrived and spent sixty seconds speaking with Plaintiff. *Id.* at 14, ¶ 53. In this brief conversation, "it was [Plaintiff] who guided the conversation asking [Paramedic] Onstott's name and telling him to introduce himself and to 'talk to me like a real dude.'" *Id.* ¶ 54. Paramedic Onstott later wrote in his report that Plaintiff "would have random spurts of uncontrollable laughter [and] . . . [w]ould start screaming random things and would ask questions that didn't make sense. [Plaintiff] was verbally and physically aggressive and showed no signs of cooperative [sic] with Fire or PD." *Id.* at 14–15, ¶ 56. Additionally, Paramedic Onstott's report stated:

> ALS assessment performed. Pt history and vitals obtained. Trauma assessment performed. Medic 7 crew did the best they could to try and calm patient down and assured pt we are here to help. Pt did not cooperate with us and became verbally aggressive and was still physically aggressive despite being in handcuffs. There

> was high concern for patient becoming extremely violent if not in handcuffs. After trying to calm patient multiple times, and pt being hypertensive, hot to touch, and delirious, it was determined pt was in excited delirium and administered 450 mg of Ketamine. 4-lead placed. Capnography used to monitor breathing. SPO2 monitored and continuous vitals obtained. IV administered. BGL obtained. Transported nonemergent to St. Anthony's ER and transferred care to PA in room 6.

*Id.* at 15, ¶ 57.

As stated in his report, Paramedic Onstott reported that Plaintiff "suffered from excited delirium." *Id.* ¶ 59. Plaintiff contends that Paramedic Onstott did not follow proper protocols for how to determine "excited delirium," such as taking his temperature. *Id.* at 16, ¶ 60. Despite this, based on this "excited delirium" determination, Paramedic Onstott injected Plaintiff with ketamine. *Id.* at 15–16, ¶ 59.

In 2019, West Metro "was one of 63 agencies that received waivers to use ketamine in a pre-hospital setting for patients who met the clinical criteria for excited delirium and/or extreme or profound agitation." *Id.* ¶ 121. "Colorado requires the medical directors of EMS agencies to obtain authority [i.e., a waiver] from the State for the agency's paramedics to be able to administer ketamine to patients in a pre-hospital setting." *Id.* ¶ 116. The Doctor Defendants are the medical directors in charge of the West Metro ketamine waiver. *Id.* ¶ 455. Ms. Schad, "who is just an assistant, rubberstamp[ed] the approval of [Plaintiff's] ketamine administration after the fact." *Id.* ¶ 174.

In the order they appear in the SAC, Plaintiff's claims are :

(1)     Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983 for Excessive Force Resulting in Permanent Injury against Defendants City of Lakewood, Agent Palomo, Agent Deleon, Sgt. Bates, and Chief McCasky. ECF 134 ¶¶ 219–68.

(2)     Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983 for Excessive Force against Defendants West Metro Fire Rescue, Paramedic Onstott, EMT Herrera, and Chief Lombardi. *Id.* ¶¶ 269–297

(3)     Violation of Substantive Due Process under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 against Defendants West Metro Fire Rescue, Paramedic Onstott, Dr. Peter Vellman, and Dr. David Richter. *Id.* ¶¶ 298–336.

(4)     Violation of the Fourteenth Amendment for Failure to Ensure Basic Safety and Provide Adequate Medical Care and Treatment against Defendants City of Lakewood, West Metro Fire Rescue, Paramedic Austyn Onstott, EMT Herrera, Chief Lombardi, Dr. Peter Vellman, Dr. David Richter, and Gretchen Schad. *Id.* ¶¶ 337–69.

(5)     *Monell* Claim for Failure to Train, Screen and Supervise against Defendants City of Lakewood and West Metro Fire District. *Id.* ¶¶ 370–97.

(6)     Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983 for Unlawful Seizure against Defendants Agent Palomo, Agent Deleon, and Sgt. Bates. *Id.* ¶¶ 398–415.

(7)     Violation of the Fifth and Fourteenth Amendments Pursuant to 42 U.S.C. § 1983 for Malicious Prosecution and Abuse of Process against Defendants City of Lakewood, Agent Palomo, Agent Deleon, Sgt. Bates, and Detective Simpson. *Id.* ¶¶ 416–441.

(8)     Medical Negligence and Malpractice under Colorado law against Defendants West Metro Fire Rescue, Paramedic Onstott, EMT Herrera, Dr. Vellman, Dr. Richter, and Gretchen Schad.

*Id.* ¶¶ 222, 244, 264.

## II.    **Procedural Background**

Plaintiff initially filed this suit on January 29, 2021. ECF 1. On March 3, 2021, Plaintiff filed his Amended Complaint. ECF 9. Waivers of service and summonses were returned executed beginning on April 30, 2021 through June 28, 2021. On August 9, 2021, Plaintiff filed an unopposed motion for leave to file his SAC, proposing to eliminate certain defendants and "to simplify and better focus the lawsuit into a more manageable endeavor for all parties involved." ECF 132. Judge Moore granted the motion the next day. ECF 133. Plaintiff filed his SAC on August 12, 2021. ECF 134. Based on a prior motion, the remaining Defendants had a uniform response date to answer or respond to the SAC. ECF 121. Defendants filed their respective motions

on September 13, 2021, except for the Doctor Defendants who received an additional extension to September 17, 2021. ECF 145; ECF 148; ECF 149; ECF 155.

## LEGAL STANDARDS

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 679. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). Thus, while the Rule 12(b)(6)

standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id*. (quotation marks and citation omitted).

## <u>ANALYSIS</u>

The doctrine of qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Because qualified immunity is an immunity from suit, rather than a mere defense to liability, it is effectively lost if a case is erroneously permitted to go to trial. *Id*. at 231; *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) ("The privilege is an immunity from suit rather than a mere defense to liability."). The

"driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery." *Pearson*, 555 U.S. at 231–32 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)). Accordingly, qualified immunity questions must be resolved at the earliest possible stage in litigation." *Id*. at 232.

When a defendant asserts qualified immunity, the plaintiff has a two-fold burden to overcome the asserted immunity: (1) "rebut the [defendant's] no-constitutional-rights arguments" and (2) "demonstrate that any constitutional violation was grounded in then-extant clearly established law." *Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015) (citing *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009)); *see also Felders v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) ("[T]he 'record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.'" (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001))). An official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). To satisfy the clearly established prong of the test, the Tenth Circuit requires that "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010).

Traditionally, there has been a two-step process for resolving qualified immunity questions: "First, a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right. . . . Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of the defendant's alleged

misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194 (2001) (internal citations and quotation marks removed)). However, the Supreme Court has afforded courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

## I.      Fourth Amendment—Excessive Force

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Pauly v. White*, 874 F.3d 1197, 1214–15 (10th Cir. 2017) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). This reasonableness standard is an objective one, "judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "In determining the reasonableness of the manner in which a seizure is effected, '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). "This balancing test 'requires careful attention to the facts and circumstances of each particular case, including *the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight*.'" *Pauly*, 874 F.3d at 1215 (quoting *Graham*, 490 U.S. at 396) (emphasis in original).

### A.      Lakewood Defendants

Here, the claims of excessive force against the Lakewood Defendants concern the following factual allegations. The group home employees called to report that Plaintiff was

"charging" the group home. SAC at 9, ¶ 25. When the 911 operator asked if Plaintiff had any weapons, the caller replied, "He says he has knives in his pockets or something like that." *Id.* Agent Palomo arrived at the scene first, i*d.* ¶ 27, and approached Plaintiff only after observing he had a phone in his hands, i*d.* ¶¶ 27–28. Agent Palomo then searched Plaintiff for weapons and found no knife. *Id.* ¶ 31. Plaintiff "then retreated from Agent Palomo to return to Ms. Springsteen's property." *Id.* ¶ 32. Agent Palomo followed Plaintiff "onto Ms. Springsteen's private property, pushed him, [and] searched him." *Id.* Sometime after, Agent Deleon arrived at the scene and immediately pulled out her taser and pointed it at Plaintiff. *Id.* at 11, ¶ 35. Only after that did Plaintiff voluntarily sit "down, and then la[y] down spread eagle, on the driveway so as to appear unthreatening and submissive to officers and to diffuse the situation." *Id.* ¶ 40. Despite this, "three officers came up onto his property, forced him to a seated position, and forcefully and painfully handcuffed him behind his back." *Id.* at 11–12, ¶ 41. Specifically, Plaintiff alleges that Agent Deleon put her "knee into [his] spine and effect[ed] a 'twist lock.'" *Id.* at 12, ¶ 44. Also, "[a]gents forced [his] arms and wrists sickeningly backward into painful positions over and over again, causing abrasions and ligament damage." *Id.* ¶ 45.

Analyzing these facts, the Court finds the *Graham* factors weigh in favor of the Lakewood Defendants. As to the first factor, Plaintiff argues that the Court should only look to the suspected protection order violation as the underlying offense since Sgt. Bates stated this was the "sole reason for the arrest." Resp. at 6–7. Yet, the SAC indicates that Plaintiff was charged with more than just that crime, including felony menacing. SAC at 41–42, ¶¶ 189, 192. Under Colorado law, felony menacing through threat of a deadly weapon pursuant to Colo. Rev. Stat. § 18-3-206(1)(b) is a sufficiently serious offense. *St. George v. City of Lakewood, Colo.*, No. 18-cv-01930-WJM-STV, 2019 WL 4410007, at *7 (D. Colo. Sept. 16, 2019), *vacated in part on other grounds*, 2021 WL

5850890 (D. Colo. Dec. 9, 2021). It matters not what the officers' subjective intent was; rather, the focus is on the objective facts. *See Bailey v. Twomey*, 791 F. App'x 724, 730 n.4 (10th Cir. 2019) (recognizing that "even assuming [the] officer acted maliciously or sadistically in employing force, [the] officer's 'subjective motivations' have 'no bearing on whether a particular seizure is "unreasonable" under the Fourth Amendment'") (quoting *Graham*, 490 U.S. at 397). Because felony menacing is a serious crime, the first factor weighs in favor of the Lakewood Defendants.

Plaintiff jointly addresses the second and third *Graham* factors, arguing that the factual allegations demonstrate that he posed no threat to the officers' safety, complied with orders, and did not attempt to flee. Resp. at 7–9. However, when the officers responded to the 911 call, they knew that Plaintiff was accused of "charging" the group home. It is reasonable for officers to have perceived Plaintiff as a threat even if that "charging" allegation was false. *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) ("Indeed, even if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed."). Moreover, while the Court agrees with Plaintiff that there are no allegations supporting an active resisting of arrest, the SAC does support the conclusion that Plaintiff actively attempted to avoid engagement with the officers. For instance, after Plaintiff was searched the first time, he "retreated from Agent Palomo to return to Ms. Springsteen's property." SAC at 10, ¶ 32. Only after Agent Deleon arrived and pulled out her taser did Plaintiff stop attempting to retreat onto Ms. Springsteen's property. *Id.* at 11, ¶ 35. Considering the totality of these circumstances, the Court finds the second and third *Graham* factors also weigh in favor of the Lakewood Defendants. *See Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 766 (10th Cir. 2021) (finding "a 180-degree turn and walk[ing] away from the officers" sufficient for a reasonable officer to conclude the person is evading); *see also United States v. Briggs*, 720 F.3d

1281, 1287 (10th Cir. 2013) (noting that "'[b]olting' from officers is not the only relevant and obvious form of evasion" and that "circumstances that reasonably suggest evasion" include "an apparent attempt to create distance from the officers").

Plaintiff's allegations of force against the Lakewood Defendants includes both direct and indirect excessive force claims. The claims of direct force include: (1) being pushed by Agent Palomo; (2) having a taser pointed at him, a knee put into his back to effect a "twist lock," and his left arm being pulled backwards by Agent Deleon; and (3) being painfully handcuffed and lifted to his feet. In light of the totality of circumstances in this matter, the alleged direct use of force is minimal. Because the Court finds the *Graham* factors weigh in favor of the Lakewood Defendants, all excessive force claims as to them should be dismissed. However, the Court will provide further analysis as to each individual application of force. Further, as to the claims of indirect force, Plaintiff alleges that officers "unduly influenced" the administration of ketamine. Finally, Plaintiff alleges that the Lakewood Defendants are liable on a failure to intervene theory of liability. The Court will address each of these claims as well.

        1.    <u>Direct Force</u>

                a.    Agent Palomo

The only claim of direct force by Agent Palomo is that he pushed Plaintiff as he retreated onto Ms. Springsteen's property. SAC ¶ 32. Plaintiff had not been subdued at that point. Thus, the minimal use of force in pushing Plaintiff cannot sustain a federal claim for excessive force. *Sims v. Miller*, 5 F. App'x 825, 830 (10th Cir. 2001) ("[M]ere pushing and shoving . . . does not give rise to a  federal cause of action."). To the extent Plaintiff attempts to allege Agent Palomo should also be liable for when "three officers came up onto his property, forced him to a seated position, and forcefully and painfully handcuffed him behind his back," SAC at 11–12, ¶ 41, the claims fails

because Plaintiff has not alleged Agent Palomo's personal participation in these actions. *See Robbins v. Okla.*, 519 F.3d 1242, 1250 (10th Cir. 2008) (noting that "it is particularly important in [Section 1983 claims] that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her . . ."); *see also Pahls v. Thomas*, 718 F.3d 1210, 1225–26 (10th Cir. 2013). The same is true if Plaintiff intends to hold Agent Palomo liable for the fact that unnamed "[a]gents forced [his] arms and wrists sickeningly backward into painful positions over and over again, causing abrasions and ligament damage." SAC ¶ 45.

> b.    Agent Deleon

As to Agent Deleon, Plaintiff alleges three instances of direct force: (1) pointing the taser at Plaintiff; (2) putting her knee into his back to effect a "twist lock"; and (3) pulling his "left arm backwards and up so as to cause great pain." SAC ¶¶ 35, 37, 44. The Court will address each in turn. First, as to the taser, Plaintiff has not cited any authority in which the mere pointing of a non-lethal weapon constitutes excessive force. Additionally, the *Graham* factors' analysis above supports a finding that the pointing of the taser in this case was not excessive force. Further, a relevant inquiry in this context "is the length of time the [weapon] was pointed at the plaintiff, particularly whether the officer continued to point the [weapon] after gaining control of the situation." *Boyd v. Montezuma Cnty. Sheriff's Office*, No. 15-cv-00100-MEH, 2015 WL 2329119, at *5 (D. Colo. May 12, 2015). Here, Plaintiff was not handcuffed or subdued prior to Agent Deleon pointing the taser. Once he was—and according to the SAC once Agent Deleon became aware Ms. Springsteen was recording—she holstered the taser. The short timespan in which the taser was pointed at Plaintiff supports the finding that no excessive force violation occurred.

Second, on the issue of the knee in the back and the "twist lock," Plaintiff argues that he was already subdued, so the additional force went beyond that necessary for the circumstances. Resp. at 9–10. Certainly, "the use of force on effectively subdued individuals violates the Fourth Amendment." *McCoy v. Meyers*, 887 F.3d 1034, 1052 (10th Cir. 2018). But Plaintiff's case is unlike those cases he cites in his response. In *Weigel v. Broad*, the court found excessive force when the plaintiff was "handcuffed and his legs were bound," but the defendants persisted in maintaining the plaintiff "on his stomach with pressure imposed on his upper back" for a "significant period." 544 F.3d 1143, 1152–53 (10th Cir. 2008). In *Dixon v. Richer*, the plaintiff submitted to a pat down search in which he put his hands up against a van, but defendants kicked him and, as the plaintiff began to fall, hit him in the stomach with a metal flashlight. 922 F.2d 1456, 1458 (10th Cir. 1991). When the plaintiff was on the ground, Defendants got on top of him and proceeded to beat and choke him. *Id.* In *Casey v. City of Federal Heights*, the plaintiff was tasered, brought to the ground, handcuffed, had his head banged into the floor, and tasered again while on the ground. 509 F.3d 1278, 1280 (10th Cir. 2007).

In this case, the SAC does not establish that Agent Deleon used her knee after Plaintiff was already subdued, nor does it allege the type of force that was found to be excessive in the above-mentioned cases. In somewhat conclusory fashion, Plaintiff alleges officers "[r]epeatedly . . . used excessive force in handcuffing Plaintiff." SAC ¶ 44. As part of that allegation, Agent Deleon is alleged to have put her knee into Plaintiff's spine while conducting a "twist lock." *Id.* If this was in the context of placing the handcuffs on Plaintiff, then Plaintiff's arguments about excessive force after being subdued are misplaced. If this occurred while Plaintiff was handcuffed and in a seated position, *id.* ¶ 43, then he has failed to state a claim for excessive force, because Agent Deleon did not apply pressure to Plaintiff's back for a significant period of time while he was face-

down (like in *Weigel*), strike him (like in *Dixon*), or tase or beat him while handcuffed (like in *Casey*). Simply put, the minimal force used against Plaintiff through a knee in the back and a "twist lock" does not support a finding that a constitutional violation occurred. In other words, Plaintiff's allegations do not give rise to a plausible claim for excessive force, especially when considered with the Court's *Graham* factors' analysis.

Third, Plaintiff alleges Agent Deleon "purposely pulled Plaintiff's left arm backwards and up so as to cause great pain." SAC ¶ 44. For reasons the Court has already mentioned, such an action does not constitute excessive force since objective facts (and not the officers' subjective intent) necessitate the weighing of the *Graham* factors in favor of the Lakewood Defendants. Further, Plaintiff merely alleges that Agent Deleon caused "great pain" from the pulling of the arm. Pain, without an actual injury, is insufficient to sustain a claim for excessive force. *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) ("We believe that a claim of excessive force requires some actual injury that is not de minimis, be it physical or emotional."). Finally, to the extent Plaintiff intended to hold Agent Deleon liable for any other direct use of excessive force, the claims fail for the same reasons described with Agent Palomo. *Robbins*, 519 F.3d at 1250.

c.      Sgt. Bates

Plaintiff has characterized Sgt. Bates as a "Direct Participation Defendant" in the use of excessive force against Plaintiff. SAC ¶ 235. Yet, there is not a single allegation in the SAC of any use of direct force by Sgt. Bates against Plaintiff. Such an individual liability claim must necessarily fail. *Robbins*, 519 F.3d at 1250.

However, Plaintiff has also alleged supervisory liability against Sgt. Bates. To establish supervisory liability, a plaintiff must sufficiently assert: (1) personal involvement, (2) causation, and (3) a culpable state of mind. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760,

16

767 (10th Cir. 2013). "Under the first element, the plaintiff 'must show an "affirmative link" between the supervisor and the constitutional violation.'" *Burke v. Regalado*, 935 F.3d 960, 997 (10th Cir. 2019) (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014)). "This requires 'more than a supervisor's mere knowledge of his subordinate's conduct.'" *Estate of Booker*, 745 F.3d at 435 (quoting *Schneider*, 717 F.3d at 767). On the second element, "[a] plaintiff [must] establish the 'requisite causal connection' by showing 'the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'" *Dodds v. Richardson*, 614 F.3d 1185, 1195–96 (10th Cir. 2010) (quoting *Poolaw v. Marcantel*, 565 F.3d 721, 732–33 (10th Cir. 2009)). On the third element, the plaintiff "must establish that the supervisor acted knowingly or with 'deliberate indifference' that a constitutional violation would occur." *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151–52 (10th Cir. 2006).

In his response, Plaintiff matter-of-factly states that Sgt. Bates "failed to supervise his officers on scene." Resp. at 12. This matches the SAC in which there are no supporting assertions that establish the necessary "affirmative link" between Sgt. Bates and the alleged use of excessive force. The SAC alleges, in conclusory fashion, that Sgt. Bates failed to supervise the alleged excessive force, SAC ¶ 245, caused the deprivation of Plaintiff's rights by failing to supervise, *id.* ¶ 246, and was done with deliberate indifference, *id.* ¶¶ 247, 252. But the non-conclusory factual allegations in the Complaint do not support that conclusion. Plaintiff has not plausibly alleged Sgt. Bates "'promulgated, created, implemented[,] or possessed responsibility for the continued operation of a policy' . . .or 'the establishment or utilization of an unconstitutional policy or custom.'" *Burke*, 935 F.3d at 997 (citations omitted). Nor does the SAC allege how any specific action by Sgt. Bates "'set in motion a series of events' [he] reasonably should have known would

result in the [constitutional violation]." *Schneider*, 717 F.3d at 769. Finally, Plaintiff's SAC fails to establish through supporting factual allegations the requisite mental state to sustain a supervisory liability claim. *Serna*, 455 F.3d at 1154–55. For these reasons, the supervisory liability claim against Sgt. Bates for failure to supervise excessive force should be dismissed.

### 2.    Indirect Force

Plaintiff seeks to hold the Lakewood Defendants liable because they were complicit in the injection of ketamine. Put differently, the Lakewood Defendants caused the ketamine injection to occur by calling the paramedics because "[t]hey knew that if paramedics came, [Plaintiff] would be forcibly injected." Resp. at 5–6. Plaintiff points to Colorado law subsequently banning the use of ketamine after the Elijah McClain and Aurora police incident in support of his claim against the Lakewood Defendants. *Id.* at 11–12. Additionally, Plaintiff seeks to hold Chief McCaskey liable on a failure to intervene theory. The Court will address the indirect use of force claims generally before proceeding specifically to the claim against Chief McCaskey.

### a.    Generally

As an initial matter, Plaintiff generally alleges that law enforcement "unduly influenced" Paramedic Onstott to administer ketamine. *E.g.*, SAC ¶ 407. The SAC only alleges that Agent Palomo spoke to Paramedic Onstott, but the content of that conversation is not alleged. *Id.* ¶ 109. Other allegations in the SAC that concern the alleged influencing of Paramedic Onstott are conclusory and thus cannot be used to support his theory of liability. *E.g.*, *id.* ¶ 245 ("Upon information and belief, Sgt. Bates (and Agents Palomo and Deleon) knew that [West Metro] was going to illegally use ketamine on Plaintiff, did nothing to stop it, and unduly influenced its use."). Additionally, Plaintiff has made additional allegations in his response that do not appear in the SAC, including that the Lakewood Defendants "knew that if paramedics came, [Plaintiff] would

be forcibly injected." Resp. at 5–6. The inclusion of additional allegations in briefing on a motion to dismiss is improper, and the Court will not consider them in the adjudication of the Motion. *Hockensmith v. Minor*, No. 18-cv-00671-STV, 2018 WL 6528117, at *7 (D. Colo. Dec. 11, 2008) ("Plaintiff's attempts to redefine the scope and nature of the Second Claim for Relief in his briefing on the [motion] are improper."); *see also Gee v. Pacheco,* 627 F.3d 1178, 1186 (10th Cir. 2010) ("Generally, the sufficiency of a complaint must rest on its contents alone."). With the lack of supporting factual allegations to support his theory of undue influence over the use of ketamine, Plaintiff has failed to state a plausible claim for relief.

Even if the allegations did state some claim for relief, Plaintiff has failed to demonstrate clearly established law. The Tenth Circuit has unambiguously emphasized that it is a plaintiff's obligation to cite to cases that satisfy the burden of demonstrating the asserted law is clearly established. *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010) ("The plaintiff bears the burden of citing to us what he thinks constitutes clearly established law."); *see also Gutierrez v. Cobos*, 841 F.3d 895, 903 (10th Cir. 2016) ("Plaintiffs failed to carry their burden of showing that [the defendants] violated clearly established federal law because their counsel did not make any legal argument in the district court to rebut qualified immunity."); *Rojas v. Anderson*, 727 F.3d 1000, 1004 (10th Cir. 2013) (finding that, although the plaintiff "might well have been able to satisfy us that Defendants' actions violated his clearly established rights," the plaintiff "through his counsel, [has simply] failed to carry the burden assigned to him by law."); *Smith v. McCord*, 707 F.3d 1161, 1162 (10th Cir. 2013) ("[The plaintiff], through his counsel, failed to carry the burden assigned him by law.")."[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016). For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on

point, or the clearly established weight of authority from other courts must support the position. *Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019), *cert. denied sub nom.*, *I.B. v. Woodard*, — U.S. —, 139 S. Ct. 2616 (2019); *Quinn*, 780 F.3d at 1005.

"The question is not whether there is a prior case with precisely the same facts, but 'whether the law put officials on fair notice that the described conduct was unconstitutional.'" *Mayfield v. Bethards*, 826 F.3d 1252, 1258 (10th Cir. 2016) (citation omitted). The Tenth Circuit has "cautioned that defining a right too narrowly risks making recovery against a public official virtually impossible because only 'those rare cases in which a precedential case existed which was 'on all fours' factually with the case at bar' would abrogate qualified immunity." *Id.* (citation omitted). On the other hand, the Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Est. of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). "[S]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an [official] to determine how the relevant legal doctrine . . . will apply to the factual situation the [official] confronts." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

Here, Plaintiff has cited no case from the Tenth Circuit or Supreme Court that squarely governs these facts. He has cited no authority that permits a finding of liability for officers who allegedly influence paramedics to administer ketamine. Plaintiff's citation to Colorado's subsequent ban on the use of ketamine is unavailing, since it does not emanate from a Tenth Circuit or Supreme Court case, and because it happened after the incident in this case. *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020) (noting that the relevant inquiry is

whether the law "at the time of the incident" was clearly established). The failure to cite any case is dispositive, and the Lakewood Defendants should be entitled to qualified immunity on this claim.

### b.   Failure to Intervene/Supervise

Plaintiff asserts the Lakewood Defendants are liable under the theory of failing to intervene "with the excessive force with regard to ketamine." Resp. at 12; *see also* SAC ¶ 236. He also brings failure to supervise claims against Sgt. Bates and Chief McCaskey. "[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "In order to be liable for failure to intervene, the officers must have 'observe[d] or ha[d] reason to know' of a constitutional violation and have had a 'realistic opportunity to intervene.'" *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) (quoting *Vondrak*, 535 F.3d at 1210).

Plaintiff's argument on this claim is contained in a single paragraph in his response:

> Plaintiff sufficiently alleged that Sgt. Bates failed to supervise his officers on scene. He also sufficiently alleged that all officers failed to intervene with the excessive force with regard to ketamine, when it was uncalled for in this circumstance. In fact, officers unduly influenced the injection by calling paramedics to the scene unnecessarily. Plaintiff cannot determine what officers said to paramedics specifically until he can obtain further discovery, so dismissal is premature.

ECF 172 at 12. But Plaintiff has not substantively addressed the Lakewood Defendants' arguments. For instance, of the named Lakewood officers, only Agent Palomo and Sgt. Bates are alleged to have been on the scene. Allegations that others, including Chief McCaskey, knew about the injection of ketamine based on "information and belief" are conclusory and do not support a plausibly stated claim. *See Vega v. Davis*, 572 F. App'x 611, 614–15 (10th Cir. 2014). For Sgt. Bates, Plaintiff has not addressed how he could be liable for failure to intervene (or supervise)

when he did not observe or had reason to know about the injection of ketamine. The SAC only alleges that Sgt. Bates tried "to distract" Ms. Springsteen as other officers moved Plaintiff. SAC ¶ 70. After the injection of ketamine, Plaintiff alleged Sgt. Bates followed the ambulance to the hospital. *Id.* ¶ 114. Neither allegation plausibly supports the notion that Sgt. Bates had reasonable opportunity to intervene (or even know about) the injection of ketamine by Paramedic Onstott.

Regarding Agent Palomo, the only Lakewood Defendant with knowledge of the ketamine injection as alleged in the SAC, he must still have had reason to know of a constitutional violation and had a realistic opportunity to intervene. The Court will explain this in more detail shortly, but there is not clearly established law that Paramedic Onstott engaged in a constitutional violation. Plaintiff has not plausibly explained how Agent Palomo would know otherwise of a constitutional violation. Also, case law "reflects the sound conclusion of the Supreme Court and the Tenth Circuit that medical professionals, rather than law enforcement personnel, are the individuals most qualified to balance" the decision of whether to sedate an individual. *Anglin v. City of Aspen, Colo.*, 552 F. Supp. 2d 1205, 1226–27 (D. Colo. Feb. 29, 2008) (citing *Riggins v. Nevada*, 504 U.S. 127, 135 (1992) and *Bee v. Greaves*, 744 F.2d 1387, 1395–96 (10th Cir. 1984)). Plaintiff thus fails to allege how Agent Palomo could intervene by overriding Paramedic Onstott's decision to inject ketamine.

For these reasons, the Court respectfully recommends dismissing the failure to intervene and supervise claims against the Lakewood Defendants.

### B.   West Metro Defendants

Here, the claims of excessive force against the West Metro Defendants concern the following factual allegations. Roughly twenty-five minutes after Agent Palomo seized Plaintiff, Paramedic Onstott arrived and spent sixty seconds speaking with Plaintiff. *Id.* ¶¶ 51, 53. In this

brief conversation, "it was [Plaintiff] who guided the conversation asking [Paramedic] Onstott's name and telling him to introduce himself and to 'talk to me like a real dude.'" *Id.* ¶ 54. Paramedic Onstott later wrote in his report that Plaintiff "would have random spurts of uncontrollable laughter [and] . . . [w]ould star screaming random things and would ask questions that didn't make sense. [Plaintiff] was verbally and physically aggressive and showed no signs of cooperative [sic] with Fire or PD." *Id.* at 14–15, ¶ 56. Additionally, Paramedic Onstott's report stated: "After trying to calm patient multiple times, and pt being hypertensive, hot to touch, and delirious, it was determined pt was in excited delirium  . . ." *Id.* ¶ 57. Plaintiff contends that Paramedic Onstott did not follow proper protocols for how to determine "excited delirium," such as taking his temperature. *Id.* at 16, ¶ 60. Based on this "excited delirium" determination, Paramedic Onstott injected Plaintiff with ketamine. *Id.* at 15–16, ¶ 59.

Plaintiff has brought his excessive force claim against all West Metro Defendants. Yet, as is evident from the above recitation of factual allegations in the SAC, Chief Lombardi and EMT Herrera did not administer Plaintiff with the ketamine. Plaintiff seeks to hold Chief Lombardi liable because he "endorsed this behavior in paramedics who were administering ketamine." ECF 173 at 5. Plaintiff does not explain in his response how EMT Herrera would be liable. The lack of any plausible allegations as to how either Chief Lombardi or EMT Herrera personally participated in the alleged use of excessive force necessitates that the claims against them be dismissed.

Regarding Paramedic Onstott, Plaintiff seeks to hold him liable under the notion that he acted as a law enforcement official "because the administration of ketamine was done for the purpose of assisting law enforcement officers rather than treating a medical need." ECF 173 at 8. Yet, Plaintiff has not cited a single Tenth Circuit or Supreme Court case directly supporting that reasoning. Those that he does cite concern police officers and not paramedics. *Graham*, 490 U.S.

386; *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009); *Saucier v. Katz*, 533 US. 194 (2001); *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304 (10th Cir. 2009); *Scott v. Harris*, 550 U.S. 372 (2007). In fact, Plaintiff has not cited a single case in which a paramedic was held liable for excessive force when that paramedic exercised medical judgment and administered ketamine to address excited delirium pursuant to a state waiver.[2] *McKenna v. Edgell*, 617 F.3d 432, 434 (6th Cir. 2010) (a case in which the plaintiff "brought suit against two Royal Oak police officers . . ."); *Frank v. Cascade Healthcare Cmty., Inc.*, No. 6:11-cv-06402, 2014 WL 793073, at *5–*7 (D. Or. Feb. 23, 2014) (regarding how law enforcement officers provided assistance in restraining an individual in the hospital); *Brown v. Dias*, No. 2:17-cv-00598, 2017 WL 10545140, at *4 (C.D. Cal. Mar. 16, 2017) (considering liability of a medical doctor providing treatment to an in-custody patient).

The most similar case Plaintiff cites is *Haas v. Cnty. of El Dorado*, No. 2:12-cv-00265, 2012 WL 1414115 (E.D. Cal. Apr. 20, 2012). There, the plaintiff, who co-workers believed had suffered a seizure, refused to be transported by ambulance after paramedics were called to the scene. *Id.* at *1. The paramedics called for police assistance, and officers responded. *Id.* When they arrived, the officers advised the plaintiff that he was required to allow himself to be transported to the hospital, and Plaintiff reiterated his objections, noting that "he felt fine." *Id.* at *2. Plaintiff attempted to walk away, but officers tackled him, struck him the face, handcuffed him, and subjected him to "at least three 'drive stun' taser shots." *Id.* The officers then ordered a paramedic to inject the plaintiff with a tranquilizer. *Id.* The court held, in part, that the paramedic defendants

---

[2] The Court recognizes that Plaintiff believes "[t]he state waiver program regarding excited delirium and the use of ketamine is illegal in the first place, as it has been shown that 'excited delirium' is junk science and because the waivers are violating state and federal law." SAC ¶ 163. Plaintiff has not, though, provided authority that the state waiver program has been found to be unconstitutional.

acted as law enforcement officials rather than emergency responders, so they were not entitled to qualified immunity on the excessive force claim. *Id.* at *9.

The facts in this case are substantially different. Paramedic Onstott's report included description that Plaintiff continued to be aggressive and combative "despite being in handcuffs," SAC ¶ 57. Paramedic Onstott recorded that Plaintiff was "being hypertensive, hot to touch, and delirious," prior to the administration of ketamine. *Id.* Although Plaintiff alleges a conspiracy in which Agent Palomo unduly influenced Paramedic Onstott to administer the ketamine, Plaintiff's own allegations show that Paramedic Onstott exercised some modicum of medical judgment in administering the ketamine after Plaintiff had been restrained. This is unlike in *Haas* in which officers demanded the assistance of paramedics in restraining the plaintiff through the injection of a sedative. Even if this case was exactly on point, it is a single district court case that cannot demonstrate clearly established law. *See Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2020).

The Court further notes that contrary to Plaintiff's assertion that there is clearly established law for Paramedic Onstott's alleged constitutional violation, case law "reflects the sound conclusion of the Supreme Court and the Tenth Circuit that medical professionals, rather than law enforcement personnel, are the individuals most qualified to balance" the decision of whether to sedate. *Anglin v. City of Aspen, Colo.*, 552 F. Supp. 2d 1205, 1226–27 (D. Colo. Feb. 29, 2008) (citing *Riggins v. Nevada*, 504 U.S. 127, 135 (1992) and *Bee v. Greaves*, 744 F.2d 1387, 1395–96 (10th Cir. 1984)). Additionally, there is no consensus of circuit court decisions that would put Paramedic Onstott on notice of his alleged excessive force. *See Peete v. Metro. Gov. of Nashville and Davidson Cnty.*, 486 F.3d 217, 222 (6th Cir. 2007) ("[T]here are no cases applying the Fourth Amendment to paramedics coming to the aid of an unconscious individual as a result of a 911 call by a family member."); *Thompson v. Cope*, 900 F.3d 414, 423 (7th Cir. 2018) ("Fourth

Amendment restrictions are almost wholly alien to that situation, where paramedics are subject to a distinct set of professional standards and goals aimed at responding to medical emergencies."). Finally, for the same reasons the Court addressed with the Lakewood Defendants, Plaintiff's pointing to Colorado's subsequent ban on ketamine cannot be the basis for clearly established law.

For these reasons, there is no clearly established law, and Paramedic Onstott is entitled to qualified immunity.

## II.   <u>Fourth Amendment—Unlawful Seizure</u>

Plaintiff asserts a claim for unlawful arrest against Agent Palomo, Agent Deleon, and Sgt. Bates. An arrest "is constitutional so long as [the defendant officers] had arguable probable cause . . ." *Strepka v. Alba*, 2016 WL 11184882, at *7 (D. Colo. Sept. 6, 2016), *recommendation adopted* 2017 WL 713631 (D. Colo. Feb. 17, 2017). "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (citation omitted). Thus, a "defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff." *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008) (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)).

Arguing that no probable cause existed, Plaintiff asserts that there was no valid protection order in place to arrest him for a violation of that protection order. Resp. at 12. Further, Plaintiff contends that there is no dispute that he had no weapon on his person. *Id.* However, Plaintiff frames

these arguments as justifications as to why there was in fact no probable cause. *Id.* at 13. Yet, that is not the standard; instead, there must be *arguable* probable cause. On both the violation of a protection order and felony menacing, the Court finds arguable probable cause.

First, Plaintiff admitted to officers that he had been drinking. SAC ¶ 50. The protection order prohibited Plaintiff from consuming alcohol.[3] ECF 149-1. Although Plaintiff asserts that the protection order was no longer valid, the document indicates an expiration date of December 3, 2020, well after the arrest in this case. *Id*. Thus, a reasonable officer could find probable cause to arrest Plaintiff for violating the protection order even if the date on the protection order was wrong. *Stonecipher*, 759 F.3d at 1141. Second, the Colorado felony menacing statute does not require use of a weapon. Rather, a person can commit menacing by "representing verbally or otherwise that he or she is armed with a  deadly weapon." Colo. Rev. Stat. § 18-3-206(1)(b). The group home employee told the 911 operator that Plaintiff "says he has knives in his pockets or something like that." SAC ¶ 25. Combined with the allegation that Plaintiff "charged" the group home, a reasonable officer would have arguable probable cause to arrest Plaintiff for felony menacing. Plaintiff's arguments to the contrary are unavailing. Agent Palomo, Agent Deleon, and Sgt. Bates should be entitled to qualified immunity on this claim.

## III.    Fourteenth Amendment Violations

### A.    Lakewood Defendants

Plaintiff asserts a claim for denial of medical treatment against all Lakewood Defendants in violation of the Fourteenth Amendment. Resp. at 14. Such a claim requires the plaintiff to show

---

[3] The Court may take judicial notice of the protection order without converting the motion into one for summary judgment. *Welch v. Saunders*, No. 15-cv-02286-WJM-CBS, 2016 WL 8577463, at *2 n.1 (D. Colo. May 26, 2016) (taking judicial notice of a protection order); *see also Rose v. Utah State Var*, 471 F. App'x 818, 820 (10th Cir. 2012).

"deliberate indifference to serious medical needs." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Estate of Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994)). Deliberate indifference claims have objective and subjective components. *Id.* The objective component requires the plaintiff to demonstrate a medical need that is sufficiently serious, namely a medical need "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). A plaintiff satisfies the subjective component when he establishes that an "official has a culpable mind, meaning that the official 'knows of and disregards an excessive risk to . . . health and safety.'" *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001). Mere negligence is not equivalent to deliberate indifference. *Sealock v. Colo.*, 218 F.3d 1205, 1211 (10th Cir. 2000).

In this case, Plaintiff contends he has plausibly alleged "that each officer acted with deliberate indifference to his medical needs first by calling in paramedics when there was no medical emergency . . . and then by standing by and pretending that they did not notice there was no medical emergency that would call for forcible injection." Resp. at 14. Plaintiff does not cite a single case in his response that supports his argument for deliberate indifference. Without support, it is not clear how the lack of a "medical emergency" constitutes a sufficiently serious medical need. Further, Plaintiff has not adequately explained how the injection of ketamine by a paramedic constitutes a serious medical need so obvious that a lay officer would recognize the need for additional medical attention. *Mata*, 427 F.3d at 751. Nor do Plaintiff's allegations plausibly satisfy the subjective element in that they do not establish that officials were both aware of a substantial risk of serious harm and drew that inference. *Martinez*, 563 F.3d at 1089. Finally, in failing to cite a single case, Plaintiff has not demonstrated clearly established law for whether officers who call

paramedics who administer medical treatment and transport the plaintiff to the hospital can be liable for deliberate indifference to medical needs.

### B.      West Metro Defendants

Plaintiff asserts two Fourteenth Amendment claims against the West Metro Defendants: forcible administration of ketamine (Third Claim for Relief) and failure to ensure basic safety and provide adequate medical care and treatment (Fourth Claim for Relief). Because both claims arise under the substantive due process clause, Plaintiff must establish deliberate indifference to plausibly state his claims. *Washington v. Harper*, 494 U.S. 210, 229 (1990); *see also Jurasek v. Utah State Hosp.*, 158 F.3d 506, 510 (10th Cir. 1998). The Tenth Circuit applies the same deliberate indifference test under these circumstances as for Eighth Amendment claims brought by prisoners. *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018); *see also Martinez*, 563 F.3d at 1088. Thus, as the Court already explained, Plaintiff needs to satisfy both the objective and subjective components of the deliberate indifference test. *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006).

The West Metro Defendants seek dismissal of these claims based on Plaintiff's failure to adequately plead the subjective component. ECF 148 at 10–11. Plaintiff disagrees, pointing to the fact that Paramedic Onstott stated Plaintiff was "oriented x 4" to person, place, time, and event but was also in excited delirium. ECF 134 ¶¶ 59–61, 426. In addition, Paramedic Onstott gave Plaintiff an overdose of 5 mg/kg of ketamine, did not check Plaintiff's vitals, and did not take his temperature. *Id.* ¶¶ 57, 60, 86. Finally, Plaintiff argues that the video of the incident proves the subjective component. ECF 173 at 13.

To begin, Plaintiff has not attached the video to his SAC nor to his response brief. Whatever the video may or may not show, the Court cannot rely on it in this ruling. Beyond that, Plaintiff's

arguments and factual allegations do not demonstrate the requisite state of mind for Paramedic Onstott. Tenth Circuit "precedent is clear that 'a misdiagnosis, even if rising to the level of medical malpractice, is simply insufficient to satisfy the subjective component of a deliberate indifference claim.'" *Strain v. Regalado*, 977 F.3d 984, 996 (10th Cir. 2020) (quoting *Self v. Crum*, 439 F.3d 1227, 1234 (10th Cir. 2006)). A plaintiff must demonstrate more than mere negligence such that the subjective component may not be met even when the "medical judgment may not have been objectively unreasonable." *Self*, 439 F.3d at 1234; *see also Hayes v. Garcia*, 123 F. App'x 858, 861 (10th Cir. 2005) ("The Supreme Court has clearly established that the due process clause was not intended to supplant general tort law . . ."). The SAC establishes that Paramedic Onstott viewed Plaintiff as combative and in excited delirium with a "high concern for [Plaintiff] becoming extremely violent." SAC ¶ 57. Plaintiff's non-conclusory allegations may establish that Paramedic Onstott acted negligently, but they do not plausibly allege that he knew Plaintiff faced a substantial risk of harm and disregarded that risk. *Callahan*, 471 F.3d at 1159. Because Plaintiff has not alleged that Chief Lombardi was on the scene or EMT Herrerra administered the ketamine, Plaintiff also has failed to plausibly allege the claims against them.[4]

### C.    Doctor Defendants

As an initial matter, the Court must first address whether the Doctor Defendants are entitled to qualified immunity. The Doctors Defendant are independent contractors working as medical directors for West Metro. SAC ¶ 312. As private individuals and not government employees, the Court must "'look both to history and to the purposes that underlie government employee immunity' to determine whether qualified immunity applies." *Estate of Lockett by and through*

---

[4] In fact, Plaintiff does not even mention EMT Herrera in his response and only mentions Chief Lombardi in conjunction with an allegedly unconstitutional West Metro policy, which is better addressed as a *Monell* claim. ECF 173 at 15.

*Lockett v. Fallin*, 841 F.3d 1098, 1108 (10th Cir. 2016) (quoting *Richardson v. McKnight*, 521 U.S. 399, 404 (1997)). Qualified immunity can extend to private individuals who are engaged in "a traditional function of government." *Id.* In other words, "had a state employee performed the same duties as [the private individual] did here, qualified immunity would apply." *Id.* at 1109. Plaintiff does not challenge in his response whether the Doctor Defendants are entitled to qualified immunity. Noting no opposition, and finding the Doctor Defendants' duties in this case part of the traditional function of government, the Court finds the Doctor Defendants eligible for qualified immunity.

Plaintiff brings a Fourteenth Amendment claim against the Doctor Defendants seemingly under two theories: (1) individual liability for the constitutional violation; and (2) municipal liability for failure to train and supervise. ECF 171 at 5, 8. Under either theory, Plaintiff fails to state a plausible claim. First, the SAC merely alleges that the Doctor Defendants allow their medical licenses to be used for the injection of ketamine pursuant to the state waiver. SAC ¶ 446. The Doctor Defendants are "supposed to supervise the use of ketamine and ensure that protocol is followed." *Id.* ¶ 312. But the Doctor Defendants were not present at the time ketamine was injected in Plaintiff and did not directly instruct paramedics to inject him with ketamine. Put differently, the Doctor Defendants did not personally participate in the alleged constitutional violation.

The Court finds *Henry v. Storey* instructive, in which Officer Storey "ran" Mr. Henry's license plate, returning a "hit" that the care was reported as stolen. 658 F.3d 1235, 1238 (10th Cir. 2011). Other officers were then called to the scene, and Mr. Harvey was pulled over. *Id.* The officers made Mr. Harvey exit his vehicle, and they arrested him. *Id.* Among the arresting officers was Officer Fangio, who allegedly knelt on Mr. Harvey's back. *Id.* When the officers later discovered the "hit" on the license plate was incorrect, they freed Mr. Harvey. *Id.* at 1237. Mr.

Harvey brought two claims for relief, including, as relevant here, a Fourteenth Amendment racial profiling claim against both Officers Storey and Fangio. *Id.* The district court granted Officer Fangio's motion for judgment as a matter of law on the racial profiling claim. *Id.* at 1241. The Tenth Circuit affirmed, reasoning that "no reasonable jury could conclude that Officer Fangio racially profiled Mr. Henry by deciding to run his license plates based on his race." *Id.* In so holding, the court recognized that Section "1983 imposes liability for a defendant's own actions— personal participation in the specific constitutional violation complained of is essential." *Id.* The court concluded that "Officer Storey's allegedly discriminatory decision to check the license plate on Mr. Henry's rental vehicle cannot result in liability for Officer Fangio, where there is no evidence that Officer Fangio himself engaged in discriminatory conduct." *Id.*

The same result must be reached in this case. Plaintiff seeks to hold the Doctor Defendants liable for the "forcible administration of medication," SAC at 63 (Third Claim for Relief), and for "failure to ensure basic safety and provide adequate medical care and treatment," *id.* at 69 (Fourth Claim for Relief). Yet, there are no factual allegations in the SAC that remotely allege the Doctor Defendants personally participated in the administration of ketamine. Without that direct link, the Doctor Defendants cannot be liable under Section 1983, lest liability improperly devolve into a type of *respondeat superior. Harvey*, 658 F.3d at 1241.[5]

Second, Plaintiff's response includes discussion of holding the Doctor Defendants liable under a "*Monell* type liability." ECF 171 at 8. The SAC does not include such a claim. Plaintiff's attempt to amend his SAC through his response brief is improper, and the Court need not consider

---

[5] Even if Plaintiff had alleged the personal participation of the Doctor Defendants, Plaintiff also fails to demonstrate clearly established law on whether doctors who use their medical licenses for a state waiver to administer ketamine can be liable under the Fourteenth Amendment for allegedly illegal uses of ketamine.

the new claim. *Hockensmith*, 2018 WL 6528117, at *7. Even if the Court did consider it, Plaintiff does not explain how the Doctor Defendants can be liable under a theory of municipal liability. As the name suggests, only municipalities may be liable under this theory. *See Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). Plaintiff has not cited authority to the contrary. Accordingly, the Court will respectfully recommend dismissing this claim against the Doctor Defendants.

### D.    Gretchen Schad

Ms. Schad, the sole defendant who does not assert qualified immunity, argues that Plaintiff has failed to plausibly plead that she is a state actor or is acting under color of state law. ECF 145 at 8. The Court agrees. Section 1983 requires that "a plaintiff must 'allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under the color of state law.'" *Bruner v. Baker*, 506 F.3d 1021, 1025–26 (10th Cir. 2001) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct . . ." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (internal quotation omitted). A plaintiff may sue a private actor under Section 1983 only if "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n.*, 531 U.S. 288, 295 (2001).

The SAC alleges that Ms. Schad is an employee at St. Anthony's Hospital/Centura and an assistant to Dr. Vellman. SAC at 4, § B (Defendant 13). Plaintiff specifically alleges that Ms. Schad, "who is just an assistant, rubberstamp[ed] the approval of [Plaintiff's] ketamine administration after the fact." *Id.* ¶ 174. Plaintiff further alleges Ms. Schad "is charged with

reviewing incident reports and reporting to Dr. Vellman." *Id.* ¶ 348. Pointing to Dr. Vellman's reliance on being a state actor, Plaintiff contends Ms. Schad must too be a state actor or acting under color of state law. ECF 171 at 17. However, Plaintiff does not support this contention with a single citation to any authority. Instead, he relies on additional factual allegations which are not in the SAC and cannot be considered by the Court here. *Id.* ("Ms. Schad helps [Dr. Vellman] oversee the state ketamine waiver system . . ."); *see also Gee,* 627 F.3d at 1186 (holding that courts must examine the four-corners of the pleading). Despite Plaintiff's protestations to the contrary, the SAC does not plausibly allege a "close nexus between the State" and Ms. Schad's rubberstamping of documents after-the-fact regarding his ketamine injection. *Brentwood Acad.,* 531 U.S. at 295. Plaintiff has failed specifically to identify any authority holding administrative assistants as acting under color of state law when carrying out their administrative tasks. For these reasons, the Court respectfully recommends dismissing the claim against Ms. Schad for failure to plausible plead she is a state actor or acting under color of state law.[6]

## IV.   *Monell* **Claims**

To establish municipal liability, Plaintiff first must demonstrate that the individual police officers committed a constitutional violation. *Ellis v. Ogden City,* 589 F.3d 1099, 1104 (10th Cir. 2009) (citing *Monell v. New York,* 436 U.S. 658, 690 (1978)).

The next element of Section 1983 municipal liability asks whether a policy or custom was the moving force behind the constitutional violation. *Myers v. Okla. Cty. Bd. of Cty. Comm'rs,* 151 F.3d 1313, 1317 (10th Cir. 1998). This requires Plaintiff to establish (1) the existence of a

---

[6] Although Ms. Schad does not raise this argument, the Court also notes that even if Ms. Schad was a state actor, dismissal would still be proper for the same reasons articulated with the Defendant Doctors; namely, Plaintiff has failed to plausibly plead Ms. Schad's personal participation in the administration of ketamine.

municipal policy or custom, (2) causation, and (3) deliberate indifference to the risk of harm. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). A municipal policy or custom can take various forms, including: (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice, that although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; and (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused. *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F. 3d 1175, 1189–90 (10th Cir. 2010)) (quotations marks omitted).

### A.      City of Lakewood

As it concerns the City of Lakewood, Plaintiff makes clear that his claim hinges on "continuing, persistent and widespread practice of unconstitutional misconduct." Resp. at 15. He argues his SAC plausibly asserts his *Monell* claim for four reasons. First, the SAC alleges other incidents in which the "Lakewood Police Department has used excessive force, and that they excessively used ketamine." *Id.* at 16. Second, Plaintiff alleges he suffered "multiple harms" by the officers' excessive force, that the force "occurred in the open," and "multiple officials" were involved. *Id.* at 17. Third, Plaintiff contends he has plausibly alleged "the specific topic of the challenged policy or training inadequacy." *Id.* at 17–18 (citation omitted). Fourth, Plaintiff's allegations demonstrate that the City of Lakewood took no steps to reprimand otherwise adequately respond to the allegedly unconstitutional conduct. *Id.* at 18–19.

Regardless of these arguments, the Court notes that it has found no plausibly pleaded constitutional violation for any of the Lakewood Defendants. Because an underlying constitutional violation is a prerequisite to a *Monell* claim, Plaintiff's claim against the City of Lakewood must necessarily fail. *Ellis*, 589 F.3d at 1104–5 ("Since the officers were not alleged sufficiently to have committed a constitutional violation, they could not provide the nexus required for municipal liability under § 1983.").[7]

### B.    West Metro

Under the same claims for relief, Plaintiff brings a *Monell* claim against West Metro. In his response, Plaintiff argues that West Metro has "multiple informal, unconstitutional customs amounting to a widespread practice." ECF 173 at 16. Yet, like with the Lakewood claims, the Court generally has recommended finding no constitutional violation and granting the individual West Metro Defendants qualified immunity. Thus, most of the bases supporting the *Monell* claim cannot actually be used to establish the claim. However, there is an exception to Paramedic Onstott's alleged excessive force claim in which the Court recommended dismissal based on lack of clearly established law. The Court's finding that Paramedic Onstott is entitled to qualified immunity in this instance does not shelter West Metro from liability. *Hinton v. City of Elwood*, 997 F.2d 774, 782–83 (10th Cir. 1993); *see also Franco v. City of Boulder, Colo.*, No. 19-cv-02634-MEH, 2021 WL 857601, at *17–*20 (D. Colo. Mar. 8, 2021) (denying summary judgment

---

[7] The Court also notes that Plaintiff has sued individual defendants in their official capacities. However, Plaintiff's "official capacity" claims asserted against each of the named individual Lakewood Defendants are duplicative of his various *Monell* claims. As such, they should be dismissed, regardless of whether he plausibly pleaded a *Monell* claim. *See e.g.*, *French v. City of Cortez*, 361 F. Supp. 3d 1011, 1042 (D. Colo. 2019) (dismissing "official capacity" claims as duplicative) (citing *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for under *Monell* . . . local government units can be sued directly")).

on *Monell* claim in which individual defendants were entitled to qualified immunity on basis of lack of clearly established law).

The Court will assume, without deciding, that Plaintiff has established a constitutional violation. With that assumption, the Court proceeds to whether Plaintiff has plausibly pleaded the existence of a municipal policy or custom. Plaintiff's arguments for West Metro's widespread policy mirror his Lakewood Defendants' arguments mentioned earlier, and the Court will address them in that order.

First, Plaintiff claims he alleges multiple instances of West Metro failing to train its paramedics from unconstitutionally injecting people with ketamine.  The Court disagrees. The SAC is devoid of such allegations. Instead, Plaintiff cites to instances of other cities (such as Aurora) or government agencies improperly administering ketamine. SAC ¶ 96; ECF 173 at 17 ("Plaintiff alleges that in the last decade, there have been multiple incidents in Colorado . . ."). Those other instances do not, though, involve West Metro or any policy or custom it may have. Plaintiff further alleges in his response that the SAC contains allegations that West Metro was forced to issue a public comment on its ketamine administration. ECF 173 at 17. But the SAC does not contain that allegation, so, for the reasons the Court has explained elsewhere, that allegation cannot support Plaintiff's claim. Plaintiff's SAC simply fails to plausibly allege an informal custom or policy through the use of multiple instances of ketamine injection. *Cf. Estate of Valverde v. Dodge*, No. 16-cv-01703-MSK-MEH, 2017 WL 3530282, at *4 (D. Colo. Aug. 17, 2017) (finding three alleged incidents of repeated conduct that spanned a significant time period sufficient to plausibly allege an informal custom or policy).[8]

---

[8] Although the Court will not address this in detail—since the Court need not address it in light of Plaintiff's failure to plead a policy or custom—this argument also defeats the notion that West Metro acted with deliberate indifference. *Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("A pattern

Second, Plaintiff asserts that there was an informal policy or custom because the alleged excessive force occurred in the open with multiple officials involved in the misconduct. ECF 173 at 18. This argument fails because Plaintiff has not plausibly demonstrated that West Metro would be on notice of this policy or custom through the single use of force described in this case. As to West Metro, only Paramedic Onstott was directly involved with the injection of ketamine. Multiple West Metro officials were not involved. *Cf. Arakji v Hess*, No. 15-cv-00681-CMA, 2015 WL 7755975, at *5–*6 (D. Colo. Dec. 2, 2015) (finding pattern or custom when plaintiff alleged at least twelve incidents involving "no fewer than sixteen different officers"). Moreover, as already mentioned, Plaintiff has not plausibly demonstrated repeated violations, either in reference to him specifically or to the public more generally, in the administration of ketamine. *See Lankford v. City of Hobart*, 73 F.3d 283, 287 (10th Cir. 1996) (finding "isolated and sporadic acts" did not amount to a custom under Section 1983). This argument does not move the needle in Plaintiff's direction.

Third, Plaintiff contends he has sufficiently alleged the specific topic of the challenged policy or training inadequacy. He grounds this claim on the notion that he has properly alleged "multiple unconstitutional customs that [West Metro] and Defendant Lombardi ha[ve] condoned, and that these customs caused the violation of his constitutional rights." ECF 173 at 19. But Plaintiff's allegations are largely conclusory. *E.g.*, SAC ¶ 333 (West Metro "has a custom, policy, and practice of through its employees, employing excessive force through among other things, the unnecessary, illegal, and excessive use of ketamine . . ."). These do not plausibly explain "how [an official] was trained, who he was trained by, or why his training was deficient." *Sexton v. City of Colo. Springs*, No. 20-cv-00108-PAB-KMT, 2021 WL 1210375, at *18 (D. Colo. Mar. 31, 2021).

---

of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate [the municipality's] deliberate indifference for purposes of [a] failure to train [claim].").

Regardless, Plaintiff's argument does not resuscitate the lack of plausible allegations that there was a "widespread" practice or custom.

Fourth, Plaintiff points to allegations in his SAC that West Metro did not reprimand or punish any individuals involved. ECF 173 at 19. Plaintiff's citations in support of this argument are distinguishable from this case. In *Cordova v. Aragon*, the Tenth Circuit noted that "[a] failure to investigate or reprimand might also cause a future violation[,]" but it did so in the context of whether there was a causal connection. 569 F.3d 1183, 1194 (10th Cir. 2009). The Tenth Circuit did not hold that a failure to discipline officials itself constitutes a policy or custom for alleged failure to train or supervise on matters of excessive force. In *Ortega v. City and Cnty. of Denver*, the court found testimony from an independent monitor that Denver had a "'systemic problem' of officers not being held accountable for their uses of force" sufficient to defeat summary judgment. 944 F. Supp. 2d 1033, 1039 (D. Colo. Feb. 6, 2013). Beyond conclusory allegations, Plaintiff has not alleged a similar "systemic problem" here. Finally, the court in *Trujillo v. City and Cnty. of Denver* relied on multiple, specific instances of alleged wrongdoing, including multiple allegations that numerous officials were not disciplined over a span of time. No. 16-cv-01747-WJM-MJW, 2017 WL 1364691, at *6–*7 (D. Colo. Apr. 14, 2017). No such allegations exist in this case.

To the extent Plaintiff bases his municipal liability claim on a ratification theory concerning the lack of discipline of officers, Plaintiff's claim also fails. Plaintiff failed to allege any final policymaker would have known the West Metro Defendants' actions violated Plaintiff's rights in this context. "[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions." *Bryson v. City of Okla. City*, 627 F.3d 784, 790 (10th Cir. 2010). Plaintiff's SAC does not contain plausible, non-conclusory allegations "regarding an affirmative approval of [the

officials'] actions." *Twitchell v. Hutton*, No. 10-cv-01939-WYD-KMT, 2011 WL 318827, at *5 (D. Colo. Jan. 28, 2011) (citing *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010)). Thus, any claim based on a ratification theory must fail.

Plaintiff makes a final argument, citing non-binding authority from other courts, that dismissal as this stage would be inappropriate because he needs additional discovery to allege the specifics of the policies and customs at issue. ECF 173 at 18. But the problem is not Plaintiff's lack of specificity; it is his lack of plausible allegations demonstrating a widespread policy or custom. Plaintiff "cannot state a plausible claim of municipal liability by identifying a single incident of alleged violations and then, without further factual substantiation, contending that such actions were consistent with and caused by a municipal policy, procedure, or failure to train." *Salazar v. Castillo*, No. 12-cv-01481-JLK, 2013 WL 69154, at *6 (D. Colo. Jan. 7, 2013).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "[P]roving that a municipality itself actually caused a constitutional violation by failing to train the offending employee presents difficult problems of proof, and [courts] must adhere to a stringent standard of fault, lest municipal liability under § 1983 collapse into *respondeat superior*." *Id*. at 70. Plaintiff has not plausibly alleged a policy or custom at West Metro sufficient to sustain his *Monell* claim. Therefore, the Court respectfully recommends dismissing this claim.

## V.   **Malicious Prosecution**

Plaintiff also asserts a malicious prosecution claim against the Lakewood Defendants (except Chief McCaskey). SAC ¶¶ 416–41. In the SAC, the claim is brought pursuant to violations of the Fifth and Fourteenth Amendments. *Id.* The Lakewood Defendants argue, and Plaintiff does not dispute in his response, that the claim is properly addressed pursuant to the Fourth Amendment.

ECF 149 at 18–19 n.22. The Court agrees and proceeds accordingly. *Montgomery v. Chernak*, No. 18-cv-00217-REB-KLM, 2019 WL 979071, at *13 (D. Colo. Feb. 28, 2019), *recommendation adopted* Order dated March 26, 2019, ECF 50; *see also Myers v. Koopman,* 738 F.3d 1190, 1193 (10th Cir. 2013). The Tenth Circuit looks to the common law elements of malicious prosecution for Section 1983 claims. *Id*. Thus, a plaintiff must prove: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Lopez v. Prince*, No. 11-cv-02352-CMA-BNB, 2012 WL 3277178, at *5 (D. Colo. Aug. 9, 2012). "Generally, a police officer cannot be sued for malicious prosecution under § 1983 because the 'chain of causation is broken' between the arrest and the actual prosecution." *Barton v. City and Cnty. of Denver*, 432 F. Supp. 2d 1178, 1207 (D. Colo. 2006) (quoting *Taylor v. Meacham*, 82 F.3d 1556, 1564 (10th Cir. 1996)). An exception to this general rule exists when malicious prosecution claims based on an officer's misrepresentations to or concealment of facts from the prosecutor. *Montgomery*, 2019 WL 979071, at *13.

The Court recognizes that Plaintiff alleges officers made various misrepresentations, including writing in the police reports that Plaintiff was combative and failing to mention felony menacing at the scene. Resp. at 13–14. However, the Court has already found that Agent Palomo, Agent Deleon, and Sgt. Bates had arguable probable cause for at least two of Plaintiff's charges. Plaintiff cannot, therefore, establish the third element of his claim. *Montgomery*, 2019 WL 979071, at *13 (holding that because "Plaintiff has alleged sufficient facts to support a reasonable inference that Defendants had probable cause for the arrest, . . . Plaintiff cannot establish the third element to proceed on his malicious prosecution claim."). As for the other charges, "the law is not clearly

established in the Tenth Circuit as to whether probable cause to pursue one charge precludes a malicious prosecution claim with respect to any other charge brought simultaneously." *Id.* (citing *Van De Weghe v. Chambers*, 569 F. App'x 617, 619–20 (10th Cir. 2014)). Accordingly, a finding of qualified immunity on this claim is warranted.

As to Detective Simpson, the sole substantive allegation in the SAC alleges: "Not satisfied that near death and felony charges were enough, Defendant Simpson then charged Plaintiff with 4 more inexplicable charges for an event that had allegedly taken place nearly 6 months prior, causing Plaintiff another warrant and a second bond to be posted as further intimidation and malicious prosecution." SAC ¶ 432. Plaintiff elaborates in his response that "the fact that Detective Simpson did not pursue charges for six months, and until after Plaintiff had been forcibly injected, [is] enough facts to show this prosecution was malicious." Resp. at 14. But the sole allegation in the SAC provides no plausible allegation that Detective Simpson's charges (whatever they were) lacked probable cause. Moreover, the SAC does not allege that Detective Simpson misrepresented or concealed any fact from prosecutors. In fact, the SAC, and as confirmed by the response, relies exclusively on the fact that Detective Simpson waited six months to brings charges. That, alone, is insufficient to plausibly state a claim for malicious prosecution.

## VI.   Medical Negligence

Plaintiff's Eighth Claim for Relief asserts a medical negligence claim against the West Metro Defendants, the Doctor Defendants, and Ms. Schad. SAC ¶¶ 442–461. To establish such a claim, the plaintiff must "show a legal duty of care on the defendant's part, breach of that duty, injury to the plaintiff, and that the defendant's breach caused the plaintiff's injury." *Day v. Johnson*, 255 P.3d 1064, 1068–69 (Colo. 2011).

### A.      West Metro Defendants

Plaintiff asserts a medical negligence claims against West Metro, Paramedic Onstott, and EMT Herrera. SAC ¶¶ 442–461. The West Metro Defendants argue this claim is barred by the Colorado Governmental Immunity Act ("CGIA"). The CGIA provides "[a] public entity shall be immune from liability in all claims for injury which lie in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by the claimant . . ." Colo. Rev. Stat. § 24-10-106(1). Further, "[a] public employee shall be immune from liability in any claim for injury . . . which lies in tort or could lie in tort . . . and which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing such injury was willful and wanton." Colo. Rev. Stat. § 24-10-118(2)(a). Pursuant to Colo. Rev. Stat. § 24-10-106, there are exceptions to this immunity for injuries resulting from specific conditions. One example is injuries resulting from the "operation of a motor vehicle . . . by a public employee while in the course of employment." *Id.* § 24-10-106(1)(a).

Plaintiff has not addressed these arguments. Regardless, the Court agrees with the West Metro Defendants. "[W]hether a particular claim lies in tort or could lie in within the meaning of the [statute] depends upon the factual basis underlying the claim." *Colo. Dep't of Transp. v. Brown Grp. Retail, Inc.*, 182 P.3d 687, 691 (Colo. 2008). A claim for medical negligence or malpractice sounds in tort, and none of the exceptions in Section 24-10-106 apply to this case. The West Metro Defendants acted within the scope of the employment throughout the alleged events in this case. Although Plaintiff makes allegations that the West Metro Defendants acted wantonly or willfully, these allegations are conclusory. Accordingly, the Court finds that the CGIA bars Plaintiff's

medical negligence claim against the West Metro Defendants and respectfully recommends that claim be dismissed.[9]

### B.    Doctor Defendants

The Doctor Defendants argue that Plaintiff's claim must fail because he has not alleged facts demonstrating they owed him a duty or that create vicarious liability for the acts of the paramedics.[10] ECF 155 at 13. Plaintiff responds that in allowing their medical licenses to be used to administer the ketamine, the paramedics are proxies for the Doctor Defendants, and they establish a "master-servant relationship with the paramedic." ECF 171 at 16. For the following reasons, the Court agrees with the Doctor Defendants.

Under Colorado law, medical malpractice or medical negligence "arises out of the professional relationship between physician and patient." *Greenberg v. Perkins*, 845 P.2d 530, 534 (Colo. 1993). A physician-patient relationship exists when "a physician undertakes to treat or otherwise provide medical care to another." *Id.* Here, Plaintiff has not plausibly alleged facts demonstrating any action by the Doctor Defendants in which they sought to provide medical care to Plaintiff. As the Court already described, the Doctor Defendants were not present at the time ketamine was injected nor did they instruct any medical professional to inject ketamine. Plaintiff cites no authority for any of his contentions in his response. In the absence of a plausibly pleaded physician-patient relationship, the Doctor Defendants owed Plaintiff no duty, and Plaintiff's claim

---

[9] Thus, the Court need not address the West Metro Defendant's additional argument on whether adequate notice was provided pursuant to the CGIA.

[10] They also initially argued that dismissal was proper for failure to file a certificate of review in compliance with Colorado law under Colo. Rev. Stat. § 13-20-602. ECF 155 at 12. The Doctor Defendants withdrew this argument after Plaintiff filed a certificate of review on June 23, 2021. ECF 182 at 10 n.2; ECF 119.

must be dismissed. *Id.* (noting the "'general rule' that in the absence of a physician-patient relationship a physician owes no duty to an examinee") (citations omitted).

Nor has Plaintiff established that the Doctor Defendants should be vicariously liable. "[T]he imposition of liability for negligent acts depends upon the existence of a master servant relationship." *Blatchley v. Cunningham*, No. 15-cv-00460-WYD-NYW, 2017 WL 4333991, at *4 (D. Colo. March 15, 2017) (citation omitted). "Where an act occurs outside the presence of the doctor, he has no opportunity to control the act, and a master-servant relationship is not established." *Id.* (citing *Bernardi v. Cmty. Hosp. Ass'n*, 443 P.2d 708, 715 (Colo. 1968)). Again, the Doctor Defendants were not present at the time of the ketamine injection; they had no opportunity to control the administration of ketamine in Plaintiff's situation. Although Plaintiff argues the use of the medical license pursuant to the state waiver creates a master-servant relationship with the paramedics, Plaintiff cites no supporting authority. Without legal authority to the contrary, the Court agrees with the Doctor Defendants that no theory of vicarious liability has been plausibly alleged.

### C.    Defendant Schad

For the same reasons just explained, the Court also respectfully recommends dismissing the medical negligence claim against Ms. Schad. Although Ms. Schad is "just an assistant," SAC ¶ 174, and not a physician, Plaintiff seeks to hold her liable for medical negligence. ECF 171 at 17. This belies reason since the SAC fails to allege Ms. Schad was at the scene when ketamine was injected, treated Plaintiff in any way for his medical needs, or even met Plaintiff. Plaintiff attempts to analogize Ms. Schad to a nurse, but, of course, nurses provide medical care and can therefore be liable for medical negligence. The Court agrees with Ms. Schad that an appropriate analogy would be to compare her to a doctor's office's receptionist who does not provide care.

Without supporting authority as to why Ms. Schad would be liable for medical negligence, Plaintiff's claim borders on frivolous. The Court respectfully recommends dismissing this claim.

## VII.   <u>Dismissal With Prejudice</u>

"In dismissing a complaint for failure to state a claim, the court should grant leave to amend freely 'if it appears at all possible that the plaintiff can correct the defect.'" *Triplett v. LeFlore Cty., Oklahoma*, 712 F.2d 444, 446 (10th Cir. 1983) (quoting 3 Moore's Federal Practice, ₽ 15.10 & n. 2 (1983)). However, "[a]t least outside of the pro se context, when a litigant fails to put the district court on adequate notice—in a legally cognizable manner—of his request for leave to amend, then the district court will not be faulted for failing to grant leave to amend." *Doe v. Heil*, 533 F. App'x 831, 847 (10th Cir. 2013). Pursuant to Fed. R. Civ. P. 15(a), "[t]he grant or denial of an opportunity to amend is within the discretion of the Court." *Maloney v. City of Pueblo*, 323 F.R.D. 358, 360 (D. Colo. 2018). As relevant here, it is within the court's discretion to deny leave to amend after a plaintiff has already been given an "opportunity to amend [its] complaint." *Bekkem*, 915 F.3d at 1275–76. In this case, Plaintiff is represented by counsel, and Plaintiff already amended his Complaint twice. ECF 9 (Amended Complaint); ECF 134 (SAC). Plaintiff has not filed a subsequent motion to amend. If the Court were to grant leave now, it would be acting *sua sponte*. The Court will not recommend doing so. *Heil*, 533 F. App'x at 847 ("[W]e will not upset the district court's dismissal with prejudice on the grounds that it failed sua sponte to give [the plaintiff]—who was represented by counsel—an opportunity to file an amended complaint."); *see also Burger King Corp. v. Weaver*, 169 F.3d 1310, 1318 (11th Cir. 1999) ("Although leave to amend should be liberally granted, a trial court is not required to sua sponte grant leave to amend prior to making its decision [to dismiss]."). Accordingly, Plaintiff's claims should be dismissed with prejudice.

## **CONCLUSION**

For the reasons described, the Court respectfully recommends Ms. Schad's motion to dismiss [filed September 13, 2021; ECF 145], the West Metro Defendants' motion to dismiss [filed September 13, 2021; ECF 148], the Lakewood Defendants' motion to dismiss [filed September 13, 2021; ECF 149], and the Doctor Defendants' motion to dismiss [filed September 17, 2021; ECF 155] be **granted**. The Court recommends finding all Defendants (except Ms. Schad) entitled to qualified immunity and dismissing with prejudice all of Plaintiff's claims.[11]

Entered and dated this 26th day of January, 2022, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

---

[11] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).